UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PHL VARIABLE INSURANCE COMPANY,

Plaintiff,

-against-

RICHARD MAHLER, JR.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:  Docket No. 1:14-CV-06244
:  (JBW) (PK)
:
:
:  **PLAINTIFF'S MEMORANDUM
:  OF LAW IN OPPOSITION TO
:  DEFENDANT'S MOTION FOR
:  SUMMARY JUDGMENT AND IN
:  SUPPORT OF CROSS-MOTION
:  FOR SUMMARY JUDGMENT**
:

Plaintiff PHL Variable Insurance Company ("Phoenix") submits this memorandum of law in opposition to Defendant's Motion for Summary Judgment, and in support of its own cross-motion for summary judgment.

## PRELIMINARY STATEMENT

This dispute is governed by unambiguous contracts between Phoenix, a life insurer, and Defendant, an insurance broker. Defendant sold a Phoenix policy and received $199,401.60 in commissions. The policy was later surrendered, and three separate provisions in the contracts now require that 100% of his commissions be refunded to Phoenix. Phoenix brought this suit to recover the outstanding amount, which Defendant refuses to repay.

Defendant erroneously contends that the 100% refund should be reduced by 20% per year for nearly five years. But he is mistaken, relying on an irrelevant provision that does not apply to this type of insurance product. He cites to footnote (f) in a Compensation Schedule in one of the contracts. But that is the wrong footnote; it applies only to *term* policies. The policy Defendant sold is an indexed *universal* life policy; the schedule lists that product (and all other universal life products) as subject to footnote (d), which reaffirms that a 100% commissions refund is required.

The contract clearly mandates that refund as a matter of law.  Phoenix is therefore entitled to summary judgment in its favor, and hereby cross-moves for same.

Defendant asserts various extra-contractual defenses, but cannot prove that Phoenix made misrepresentations that should equitably estop enforcement of the contracts.  Defendant wore multiple hats in this transaction—as the broker, he sold the policy to insure his own life, to be owned by a trust bearing his name, and with all premiums financed by a third-party lender. Defendant claims that he had to surrender the policy after nearly five years because the lender refused to offer additional financing, supposedly due to Phoenix's financial struggles.  But Defendant agreed with the lender that additional financing would be at the lender's discretion; he had no right to same.  He also makes no showing that he was unable to fund premiums himself; he chose to surrender the policy instead.  The sparse evidence he provides of Phoenix's alleged knowledge of such risks is inadmissible hearsay, and Defendant cannot prove actual causation between Phoenix's conduct and his decision to surrender.  And most importantly, none of this is relevant to the producer contracts' formation or performance.  Defendant voluntarily surrendered the policy and all premiums were refunded, so the contracts require unwinding all commissions as well, putting all parties into their pre-contractual positions.

As such, Phoenix requests that Defendant's Motion be denied in its entirety, and cross-moves for summary judgment in its favor.

## STATEMENT OF FACTS

### A.    Contract Terms Requiring Commission Chargeback

All parties agree that the operative contracts are an "Independent Producer Contract" dated June 18, 2008, and a "Subsidiary Contract" dated August 13, 2008 and incorporating the former. (*See* Defendant's Statement of Material Facts, ¶15; Defendant's Affidavit dated October 23, 2017 ("Mahler Aff.") Exs. C and D).

Pursuant to these contracts, Defendant sold a life insurance policy insuring his own life and to be owned by the Richard Mahler Family Trust.  The trust also borrowed funds via a premium financing loan to pay the policy's initial $490,000 premium, with additional financing to be provided at the lender's discretion. (*See* Mahler Aff., ¶24; Ex. G.)

Phoenix paid Defendant commissions totaling $199,401.60 relating to the policy, consistent with the terms of his contracts with Phoenix. (Mahler Aff., ¶26; Ex. I.)

The policy was surrendered with an effective date of November 18, 2013.  (Mahler Affidavit, ¶54 and Ex. L.)

Three provisions in the contracts require producers to repay all commissions in the event of a surrender and refund of premium.   The Independent Producer Contract, which was incorporated into the Subsidiary Contract by reference, provides:

> Should the Company for any reason refund any premium on any Contract sold hereunder including, but not limited to, any premiums refunded under any free look provision, You shall repay on demand any compensation received with respect thereto.

(Mahler Aff., Ex. C p.10 ("Variable Products Provisions," ¶ 4).)  It further adds:

> If a policy sold by You is lapsed, surrendered, canceled or otherwise terminated by the policyholder by exercising a right given the policyholder by the terms of any rider to the policy, all compensation paid on the policy shall be returned to the Company.

(*Id.* p. 12 ("Compensation Provisions," ¶ 7(b).)   Finally, the Subsidiary Contract contains a Compensation Schedule that provides as follows, in footnote (d):

> For any surrender of a policy where the surrender value of the policy has been enhanced by an Alternate Surrender Value Rider, Enhanced Surrender Value Rider or other similar rider, there will be a charge back of compensation paid equal to the lesser of 100% of the total compensation paid for the policy; and the amount of any cash surrender value enhancement due to such rider.

Mahler Aff., ¶19; Ex. D, footnote (d)).  Each of these provisions independently require a 100% refund of premium here, subject to no reduction or phaseout.

Defendant, seeking a 20% annual reduction in the chargeback, relies on a provision that does not apply to this type of insurance product. The Compensation Schedule lists various product types and applicable compensation provisions for each, with footnotes throughout. Five types of universal life insurance products, including "Phoenix Indexed UL" (the policy at issue here), are followed by footnote (d), quoted above. By contrast, three term life insurance products are each followed by footnote (f). (Mahler Aff. Ex. D.)

The policy is a Phoenix Indexed Universal Life Policy (Nancy Turner's Affidavit in Support of Plaintiff's Motion for Summary Judgment and in Response to Defendant's Motion for Summary Judgment, dated January 8, 2018 ("Turner Aff."), Exhibit A; Mahler Aff., Ex. L) (confirming product type). This is not a term life product, so footnote (f) in the Compensation Schedule does not apply here.

The adjustment contemplated in footnote (d) was applied and did not ultimately impact the chargeback amount. The policy contains an Alternate Surrender Value Rider. (Turner Aff., ¶3 and Ex. A.) Pursuant to that rider, Phoenix calculated and paid an Alternate Surrender Value of $490,000, equaling a $374,683.82 enhancement on top of the policy's $115,316.18 cash surrender value. (Turner Aff., Exhibit B.) PHL paid that $490,000 Alternate Surrender Value to First Insurance Funding Corp. ("First Insurance"),[1] the entity that had loaned the trust the $490,000.00 used to pay the policy premiums, and to which the policy had been assigned as collateral for the premium financing loan. (See Turner Aff., ¶5, Exhibit C.) Because the enhancement was greater than Defendant's commissions, and because footnote (d) requires a chargeback of the lesser of

---

[1] Defendant baselessly asserts that PHL may not have actually made this payment, but his own exhibit confirms the policy's surrender and the $490,000 payment Phoenix made to First Insurance as assignee (Mahler Affidavit, Ex. L), and he offers no evidence suggesting any doubt as to whether that payment was made. As cited above, it was.

those two figures, a full 100% refund of all commissions is therefore now owed to Phoenix under the contract. (Mahler Aff. Ex. D.)

To date, PHL has offset defendant's trailing commissions against the chargeback amount for which he is indebted, so that he is currently indebted to PHL in the amount of $181,075.91, which amount remains unpaid. (Turner Aff., ¶6, Exhibit D.)

## B.      Facts Pertinent to Defendant's Extra-Contractual Claims

Defendant asserts estoppel defenses suggesting that Phoenix made representations that misled him to think that no commissions chargebacks would be required.  But in his deposition testimony, he admitted that he was aware of the chargeback obligation:

> Q. When you sold this property, did you have an understanding, you selling it as the agent, the producer, did you have an understanding that if the policy was surrendered early, that you would have to pay back the commission you earned and were paid?
>
> A. I would say yes.

(Declaration of Kendall Burr in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment dated January 8, 2018 ("Burr Decl."), Exhibit A, Deposition of Richard Mahler at 129:3-10.)

Defendant also tries to hold Phoenix responsible for First Insurance's refusal to provide additional financing.  However, the $490,000 Promissory Note that Defendant and other trustees executed in favor of First Insurance includes the following provision:

> **17.3  DISCLAIMERS.**  LENDER SHALL NOT BE REQUIRED TO EXTEND ANY AMOUNTS DUE HEREUNDER (OTHER THAN THE ORIGINAL PRINCIPAL AMOUNT HEREOF) TO BORROWER OR ANY OTHER PERSON OR ENTITY, INCLUDING BUT NOT LIMITED TO ANY ADDITIONAL AMOUNTS NECESSARY TO FUND PREMIUMS DUE IN REGARDS TO THE INSURANCE POLICY.  AS A CONDITION TO MAKING ADDITIONAL LOANS HEREUNDER, LENDER MAY REQUIRE A PLEDGE OF ADDITIONAL COLLATERAL IN A TYPE AND AMOUNT DETERMINED AT THE SOLE DISCRETION OF LENDER.  BORROWER ACKNOWLEDGES

> AND AGREES THAT LENDER HAS NOT AND WILL NOT PROVIDE
> ANY ADVICE OR RECOMMENDATIONS IN CONNECTION WITH
> THE LOANS, INCLUDING BUT NOT LIMITED TO ADVICE OR
> RECOMMENDATIONS RELATING TO ESTATE OR FINANCIAL
> PLANNING, TAXES OR ACCOUNTING OR LEGAL MATTERS.
> BORROWER HAS BEEN REPRESENTED BY ITS OWN COMPETENT
> COUNSEL IN CONNECTION WITH THIS LOAN . . .

(Mahler Aff., Ex. G) (bold font, all capital letters, in original). Thus, the lender retained full discretion as to whether to provide additional financing. There is no evidence that Phoenix had any control over how the lender chose to exercise that discretion, nor that Phoenix made any promises to Defendant regarding same. Nor is there evidence that Defendant was forced to surrender the policy and that he could not have funded the premiums himself, particularly given his statements to this Court directly during a hearing that he had a net worth of $5 million when he applied for the policy. (*See* Doc. No. 26, February 21, 2017 hearing at 10:11-11:4.)

Defendant also attempts to show that Phoenix had knowledge that its business was risky and could cause its financial struggles. As detailed below, Phoenix's primary response is that such evidence is not relevant to this contract dispute; Phoenix only cites the following facts in the alternative, to identify flaws in Defendant's irrelevant and unsupportable defenses. In claiming that Phoenix knowingly accepted "risky" business destined for resale into the secondary market, Defendant relies heavily on cherry-picked testimony offered in 2010 by disgruntled former employees Ed Humphrey and James "Max" Labar, two of over 120 witnesses who testified in a California state court proceeding. As discussed below, their testimony is inadmissible hearsay and should not be the basis for dispositive relief. In the alternative, should such testimony be admitted, Phoenix would submit the following additional testimony from Mr. Humphrey, who clarified that:

- Humphrey repeatedly sent emails to producers in 2006 and 2007 affirmatively articulating Phoenix's position that it would not accept business designed for resale into the secondary market. (Burr Decl., Exhibit B, Deposition of Edward Humphrey at 302:15-303:9, 341:5-342:22; 352:1-24; 356:1-357:13.)

- Humphrey denied having told any producers or agents that Phoenix was interested in or willing to accept policies designed for resale or that Phoenix considered such business to be acceptable. (*Id.* at 197:17-198:21; 227:18-228:4; 304:24-305:11; 226:5-227:13.)

- Humphrey could not identify a single other Phoenix employee as having ever told producers or agents that Phoenix would accept that kind of business. (*Id.* at 198:22-206:6.)

Further, in the alternative and if Labar's testimony is admitted, Phoenix submits that Labar had filed a lawsuit accusing Phoenix of terminating him to retaliate against him as a "whistleblower" who had reported to state insurance departments that other Phoenix employees were selling risky business. *Labar v. Phoenix Life Ins. Co.*, Case No. 08-CIV-1278 (D. Ore.), Doc. 50 at ¶¶ 5, 8-11. Importantly, however, the District of Oregon *granted* Phoenix's motion for summary judgment dismissing his claims. *Labar*, Case No. 08-CIV-1278, Doc. 63. Labar further admitted under oath that the state insurance departments had found no factual basis for his claims, that he had no basis for his accusations about Phoenix other than hearsay that unknown Phoenix personnel were knowingly marketing such business; indeed, he had no evidence at all to support his claims about Phoenix, and had actually been fired for failure to meet his performance obligations. (Burr Decl., Exhibit C, Deposition of James "Max" Labar at 356:7-359:24, 269:1-270:22, 206:19-209:15; 221:22-223:17.) Again, Phoenix disputes that such facts are relevant, and presents them here solely in the alternative should Defendant's citations to their testimony be deemed admissible for purposes of this Motion.

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A properly supported motion shifts the burden to the opposing party to show with evidence that a material fact issue exists. Fed. R. Civ. P. 56(c)(1). The opposing

party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Summary judgment is designed to secure the just, speedy and inexpensive determination of appropriate actions, and is not a disfavored shortcut.  *Celotex Corp.*, 477 U.S. at 327.

Summary judgment is proper where, as here, the dispute involves contract interpretation and the language is unambiguous.  *Sciascia v. Rochdale Vill., Inc.*, 851 F. Supp. 2d 460, 476 (E.D.N.Y. 2012), citing *Madeleine L.L.C. v. Street*, 757 F. Supp. 2d 403, 405 (S.D.N.Y. 2010).  "'In interpreting a contract under New York law, words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.'"  *Id.* at 477, citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

The parties appear to agree that New York law governs.  The producer agreements were negotiated, made and performed in New York, and Mahler sold the policy in New York.  New York is thus the state with the most significant relationship to the transaction and the parties.  *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 618 N.Y.S.2d 609, 612 (N.Y. 1994) (describing most significant relationship test for choice of law analysis).

## A.    Defendant Breached the Contract by Refusing to Refund Commissions

As shown above, three provisions in the Independent Producer Contract and Subsidiary Contract each independently require Defendant to refund 100% of his commissions to Phoenix. For example, in Paragraph 7(b) under "Compensation Provisions" in the Independent Producer Contract, as cited in full above, all commissions must be returned simply "[i]f a policy sold by You is lapsed, surrendered, canceled or otherwise terminated by the policyholder . . ."  Here, it is undisputed that Defendant surrendered the policy, thus triggering a chargeback obligation. Similarly, under Paragraph 4 of the "Variable Products Provisions," commissions chargebacks are

8

mandated in the event of any "refund of premium," "for any reason."   Thus, when Phoenix refunded $490,000 (the full amount of premiums paid) to First Insurance, that again triggered a commission chargeback obligation.   Each action—policy surrender and premium refund—would have independently triggered a chargeback clause, and either condition standing alone would have been sufficient to require a refund here.   Both were met here.

The Compensation Schedule in the Subsidiary Contract further provides in footnote (d) that the chargeback amount might be adjusted depending on the amount of any enhancement under the policy's Alternate Surrender Value.   Because the enhancement ($374,683.82) exceeded Defendant's commissions ($199,401.60), it did not reduce the amount owed.

Defendant errs in relying on footnote (f) in the Compensation Schedule, which he argues requires a 20% annual reduction for the first five years; since the policy was surrendered after four years and eleven months, he asserts that the chargeback should have been reduced to nearly zero. But this footnote is inapplicable.   Unlike the three provisions cited above, footnote (f) is a specific rule peculiar to three Phoenix *term* life insurance products—Phoenix Protector Term-Ten (PPT-Ten); Phoenix Protector Term-Twenty (PPT-Twenty); and Phoenix Protector Term-Thirty (PPT-Thirty).   (Mahler Aff., Ex. D, p.1 of Compensation Schedule.)   The policy at issue here is not a term product; it is an indexed universal life product, and is clearly labeled in the schedule as being subject to footnote (d), not footnote (f).   *See id.*

Each element of Phoenix's breach of contract claim has therefore been met here.   *See JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 803 (N.Y. App. Div. 2010) (elements of claim include existence of a contract, plaintiff's performance, defendant's breach, and damages).   The contracts cited above were in force and govern this dispute; Defendant concedes that point and even attaches those contracts to his own motion, he just cites the wrong provision.   Phoenix performed its obligations under the contracts, and all conditions precedent to

recovery have been met, given the undisputable evidence that the Policy was surrendered and all premiums refunded. Defendant breached the contracts by refusing to refund commissions as required by three independent contract provisions, each of which requires a 100% return of commissions earned on this product. Finally, Phoenix has suffered actual economic damages in the amount of $181,075.91, the amount of Defendant's outstanding debt. Phoenix is therefore entitled to judgment in its favor on its contract claim.

**B.    Defendant's Extra-Contractual Arguments are Irrelevant, and Supported by No Evidence and/or Inadmissible and Non-Credible Evidence**

Defendant asserts four defense theories, none of which change the result mandated by the contracts. Defendant asserts no counterclaims here; each of these is a defense theory.

### 1.   *Defendant's equitable estoppel defense is irrelevant*

Defendant claims that Phoenix should be equitably estopped from enforcing the contracts because it supposedly concealed and misrepresented facts about its business risks and rating declines. But before addressing the alleged evidence, this entire argument should be rejected as tangential and irrelevant. It is important to differentiate between the multiple hats that Defendant wore in this transaction. Defendant purchased the policy and secured premium financing in his capacity as insured and trustee; when faced with the choice of whether to fund additional premiums himself, he chose to simply surrender the policy and have all premiums refunded, and suffered no related *personal* injury.[2]   His unhappiness with that choice, made in his capacity as the insured and trustee, does not entitle him to a financial windfall in his completely separate role as insurance producer. He offers no basis why he, in his capacity as producer, should get to profit from having sold a policy that was later surrendered and the premiums fully refunded. Commission chargeback

---

[2] Indeed, to the contrary, Defendant enjoyed the benefit for five years of having $10 million in life insurance coverage on his life while the policy was in effect.

provisions exist for that very purpose; when a contract is voided and premiums are refunded, all parties, including the producer, must be restored to their respective pre-contractual positions. Defendant's arguments ignore these more salient issues, and should be dismissed as red herring diversions irrelevant to the contract claim.

Further, even considering Defendant's arguments on their merits, they fail as a matter of law. A party asserting equitable estoppel must prove that the other party seeks to assert a right despite having led him to believe that the right would *not* be asserted, and that loss or prejudice would result. *757 3$^d$ Ave. Assoc.*, 117 A.D.3d 451 (N.Y. App. Div. 2014) (citing *Matter of Shondell J.V. Mark D.,* 7 N.Y. 3d 320, 326 (2006). Here, Defendant does not argue, much less prove, that Phoenix led Defendant to believe that it would not enforce a chargeback provision if the policy were surrendered. To the contrary, in his deposition, he *admitted* that he understood that he would have to pay back the commissions if the policy were surrendered. (Burr Decl., Exhibit A, Deposition of Richard Mahler at 129:3-10.) He could not credibly contend otherwise; such provisions are ubiquitous in the industry, and he accepted them repeatedly, including in an earlier contract signed in 2000. *See e.g.* Mahler Aff. Ex. A at 9, ¶ 4.

Instead of (as he must) identifying any supposed promise not to enforce the chargeback provisions, Defendant tries to prove that Phoenix knew its business was risky and should bear all consequences thereof, even his own informed decision to surrender the policy. This overbroad assertion is supported by scarce and irrelevant evidence. Defendant vaguely claims that he received "handouts" and "verbal representations" from unknown persons at a 2007 seminar about premium financing, but such claims are not specific misrepresentations or omissions about the applicability of the alleged contractual right to be enforced. *See Zumparo v. Quinn,* 6 N.Y. 3d 666, 675 (2006). Defendant also claims that Phoenix failed to inform him of the purported decline in its rating or financial condition, but that cannot be a basis for equitable estoppel absent a fiduciary

11

relationship requiring such disclosures (*see id*); no such fiduciary relationship existed here, as the contracts are simple arms' length agreements with independent contractors. *See e.g.* Mahler Aff. Ex. B at 1, ¶ 1(b). Finally, even if Defendant could prove these assertions, the logical conclusion would be (as he contends) that the Trust would not have purchased the policy—and if that were so, he would not have received a commission in the first place. In other words, he would be in the same position that the contracts now require him to restore; none of these claims explain why he should be entitled to a six-figure windfall.

Defendant also cites and attaches cherry-picked testimony given in 2010 in a California state court action by two former disgruntled Phoenix employees. But such hearsay testimony is not admissible here to prove the facts asserted. *See* Fed. R. Evid. 801-804; *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (same); *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 569 (E.D.N.Y. 2013) (rules governing admissibility same at summary judgment and at trial).[3]

Defendant is also unable to prove, as he claims, that "Phoenix knew that if the lender would not finance the premiums, that the Defendant would be unable to pay for the premiums and the Policy would have to be canceled or surrendered." (Defendant's Memo, page 6.) Defendant offers no evidence of such knowledge, nor could he. Phoenix was not a party to the loan transaction, and had no way of knowing whether Defendant or the Trust had the financial wherewithal to pay additional premiums; indeed, as Defendant advised this Court directly during a hearing, he had a

---

[3] Even if admitted, as detailed above, these employees also gave other testimony that impeaches their credibility and their unsupported accusations about Phoenix. At a minimum, their testimony cannot be relied upon here to mandate dismissal of Phoenix's contract claim—and since their testimony is ultimately irrelevant to the producer contracts, their testimony does not present fact issues requiring trial; as noted above, numerous defects bar Defendant's estoppel defenses, and the contract should be enforced by its terms.

net worth of $5 million when he applied for the policy.  (*See* Doc. No. 26, February 21, 2017 hearing at 10:11-11:4.)  Defendant nowhere proves that he was financially unable to fund additional premiums himself once First Insurance declined to fund additional premium payments, much less prove that Phoenix knew about and should be held responsible for *his* informed decision to surrender the policy instead.

Finally, Defendant offers no evidence of causation of his alleged injury—in his words, that Phoenix "caused the failure of [his] ability to pay the premium."  (Defendant's Memo, page 7). The multiple levels of inferential causation implied by Defendant are neither proven nor provable. Defendant speculates that Phoenix's business decisions caused its financial issues, but does not clarify how one "caused" the other.  There is no evidence that Phoenix "caused" third party ratings agencies to lower their ratings of Phoenix.  There is certainly no evidence that Phoenix "caused" the third party lender to decline to offer additional financing—a decision that, as Defendant agreed in the promissory note, the lender retained in its sole discretion.  And most importantly, there is zero evidence that Phoenix "caused" Defendant to choose to surrender the policy, rather than keeping it in force and paying the premiums himself.

Again, these allegations are tangential and immaterial.  The controlling standard for the equitable estoppel defense has not been met here; there is no evidence that Phoenix ever misled Defendant that it would not assert its rights under the chargeback provisions, and thus Phoenix cannot be equitably estopped from enforcing them.  *737, 3d Ave. Assoc.,* 117 A.D. 3d at 454.

### 2.  *Defendant's promissory estoppel defense likewise fails*

Defendant's promissory estoppel defense requires the same showing, and fails for the same reasons. *See Chromalloy American Corp. v. Universal Housing Systems of America,* 495 F. Supp. 544, 551 (S.D.N.Y.1980), aff'd, 697 F.2d 269 (2d Cir.1982) (doctrine reserved for "limited class of cases" where it is "unconscionable to deny the promise upon which the party had relied").

Defendant cannot prove that Phoenix made a "promise" that it is now trying to "deny." *See id.*
Defendant asserts that Phoenix "assured" him that First Insurance would pay all premiums (Memo
at p.7), but cites zero evidence of same; Phoenix was not a party to that private loan transaction,
and certainly made no promises to Defendant about how a third party financier might respond to
market changes. Defendant again claims that Phoenix had a duty to disclose its financial troubles
to him directly, and that third party lenders would "pull out" as a result—but again, Phoenix had
no such duty (*Zumparo*, 6 N.Y. 3d at 675), nor any knowledge about what third parties might do.
Finally, again, these assertions are all tangential to this case, as they do not prove that Phoenix
made a "promise" that it now seeks to "deny" about whether it would enforce chargeback
provisions in the event of a policyholder's surrender. *Chromalloy*, 495 F. Supp. at 551. This claim
therefore fails.

### 3. *Defendant's breach of implied covenant defense fails*

Defendant's next defense is an alleged breach of the implied covenant of good faith and
fair dealing in the contracts, contending that Phoenix's "risky investment strategies and conduct
of business" supposedly "undermined" his ability to "continue to" obtain funding to pay premiums.
Such arguments make no sense for the same reasons outlined above. Further, as noted, the
Promissory Note clearly provides that the lender retains discretion as to whether to offer to
continue financing; Defendant had no right to same.[4] Nor does Defendant show that he had no
viable alternative other than to surrender the policy.

---

[4] Any contention that the Note's terms are inapplicable or contradicted would not be
persuasive here. In executing the Note, Defendant, along with his co-trustees on behalf of the
Trust, as borrower, acknowledged that the Trust had "been represented by its own competent
counsel in connection with" the loan. They also acknowledged that "neither the insurance
agent/broker nor the insurance company is Lender's agent and neither can legally bind Lender in
any way or make any commitment on Lender's behalf." (Mahler Aff., Ex. G.)

Finally, again, such facts are irrelevant to the producer contracts, and do not prove a breach of the implied covenant in *those* contracts.  Phoenix acted in good faith at all times; it readily paid Defendant nearly $200,000 in commissions, and had no motivation to invite a chargeback scenario—Phoenix would obviously have preferred to keep $490,000 in premiums, and was forced to refund those premiums once Defendant chose to surrender the policy.  It is only fair, then, that the commissions paid on those premiums must be unwound as well, as required by multiple provisions in the contracts.  *Cf. Wagner v. JP Morgan Chase Bank*, No. 06 CIV. 3126 RJS, 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) ("Plaintiffs have presented no evidence that any of Defendant's management decisions were undertaken for the purpose of depriving Plaintiffs of their earn-outs.").  That Defendant happens to have been both the insured and the agent was his own choice, and does not entitle him to additional contract arguments that other producers do not enjoy.  *See Fesseha v. TD Waterhouse Investor Servs.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003) (the covenant of good faith and fair dealing "cannot be construed so broadly … to create independent contractual rights")

### 4. *Phoenix Had Not Been Unjustly Enriched*

Defendant's unjust enrichment argument is not a viable defense to a breach of contract claim in New York; indeed, the unjust enrichment theory is only available where there exists no valid contract between the parties. *Georgia Malone & Co., Inc. v. Rieder,* 19 N.Y. 3d 511, 516 (2012).  The contracts described above govern this dispute, so this defense fails as a matter of law. Defendant's argument also misstates the facts, arguing that Phoenix is "ahead $291,000.00" because Phoenix has not paid the entire $490,000.00 to First Insurance.  That is clearly wrong, as shown above. (*See* Turner Aff., ¶5, Exhibit C.) Phoenix is "behind" $181,075.91, the amount that Defendant refuses to pay back as required by the contract.

In sum, Defendant's various defenses are inapplicable and cannot overcome the contract's plain language, which requires a refund here.

### C.      Phoenix is Entitled to Summary Judgment on All Claims

Given the evidence outlined above, Phoenix is entitled to summary judgment on one or more of its four of its causes of action asserted in its Complaint. Phoenix seeks judgment in its favor on Count I for breach of contract for the reasons set forth above.

In the alternative, in the unlikely event that the Court determines that the contract does not apply here, Phoenix seeks summary judgment under an unjust enrichment theory under Count II. In other words, even if the contract did not affirmatively require Defendant to refund the commissions, it would be unjust to allow Defendant to retain such a windfall.

Phoenix also seeks summary judgment under Count III, Phoenix's cause of action for account stated. Defendant did not timely object to Phoenix's statement of account (attached as Ex. D to Phoenix's Complaint, Doc. 1-1 at 48-50). *See O'Connell & Aronowitz v. Gullo,* 644 N.Y.S.2d 870, 871-872 (3d Dep't 1996) (affirming account stated claim where defendant did not object to amount stated in the account until after plaintiff sued to collect debt).

Finally, in Count IV, Phoenix asserts conversion. Defendant has intentionally refused to refund commissions owed, and retained possession of such commissions to the exclusion of Phoenix's rights thereto. *See Meese v. Miller*, 436 N.Y.S.2d 496, 500 (4th Dep't 1981).

Phoenix seeks actual damages consisting of the outstanding balance owed, $181,075.91, plus interest. Further, should the Court determine that attorneys' fees, costs, and/or punitive damages may also be awarded, Phoenix requests a subsequent briefing schedule to separately address the amounts of such remedies.

16

**CONCLUSION**

For the foregoing reasons, Phoenix respectfully requests that the Court deny Defendant's

motion for summary judgment in its entirety, and instead grant Phoenix's cross-motion for

summary judgment in its favor.

Dated: Brooklyn, New York
      January 8, 2018

                          ABRAMS, FENSTERMAN, FENSTERMAN,
                          EISMAN, FORMATO, FERRARA, WOLF &
                          CARONE, LLP

                          By: _____
                              Susan Mauro, Esq.
                              Abrams Fensterman
                              1 MetroTech Center, Suite 1701
                              Brooklyn, NY 11201
                              (718) 215-5300
                              smauro@abramslaw.com

Of counsel:

Jarrett E. Ganer*
Kendall J. Burr*
Edison, McDowell & Hetherington LLP
3200 Southwest Freeway, Suite 2100
Houston, Texas  77027
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
  * *pro hac vice* motions to be filed

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on the 8th

day of January, 2018, on the following party by regular mail:

Richard Mahler, Jr.
596 Annadale Road
Staten Island, New York, 10312

Susan Mauro, Esq.

18