UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PHL VARIABLE INSURANCE CO.
(a subsidiary of the Phoenix Companies, Inc.),

              Plaintiff,

– against –

RICHARD MAHLER, JR.,

              Defendant.

**AMENDED MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, JUDGMENT**

14-CV-6244

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 20 2018 ★
BROOKLYN OFFICE

**JACK B. WEINSTEIN**, Senior United States District Judge:

| Parties | Appearances |
|---|---|
| PHL Variable Insurance Company | **Westley W. Medlin**<br>Edison, McDowell & Hetherington<br>1001 Fannin<br>Suite 2700<br>Houston, TX 77002 |
| Richard Mahler, Jr. | **Richard Mahler, Jr.**<br>Pro Se<br>596 Annadale Road<br>Staten Island, New York 10312<br>(917) 921-7003 |



1

## Table of Contents

I. Introduction ..................................................................................................................... 2
    A. Phoenix Policy ............................................................................................................. 2
    B. Surrender of Policy and Charge Back of Commission ................................................ 3
    C. Mahler's Defenses and Judgment ................................................................................ 4
II. Findings of Fact .............................................................................................................. 4
III. Law ............................................................................................................................... 11
    A. Breach of Contract ..................................................................................................... 11
    B. Equitable Estoppel ..................................................................................................... 11
    C. Promissory Estoppel .................................................................................................. 12
    D. Implied Covenant of Good Faith and Fair Dealing ................................................... 12
    E. Unjust Enrichment ..................................................................................................... 12
    F. Attorney's Fees .......................................................................................................... 13
    G. Pre-Judgment Interest ................................................................................................ 13
IV. Application of Law to Facts .......................................................................................... 14
    A. Breach of Contract ..................................................................................................... 14
    B. Mahler's Defenses in Equity ...................................................................................... 14
        1. Equitable Estoppel ............................................................................................. 14
        2. Promissory Estoppel .......................................................................................... 15
        3. Implied Covenant of Good Faith and Fair Dealing ........................................... 15
        4. Unjust Enrichment ............................................................................................. 16
    C. Attorney's Fees .......................................................................................................... 16
    D. Interest and Judgment Calculation ............................................................................ 18
V. Conclusion ..................................................................................................................... 18

I. Introduction

The claims of plaintiff PHL Variable Insurance Company ("Phoenix"), and the defenses raised by defendant Richard Mahler, Jr. ("defendant" or "Mahler"), were tried, on consent of the parties, without a jury. *See* Fed. R. Civ. P. 52(a)(1).

    A. Phoenix Policy

This case involves an exotic product of the insurance industry, referred to as a Phoenix Indexed Universal Life Insurance policy ("Policy").

Mahler sold this Policy, in 2008, as an agent of Phoenix, insuring his own life. The Policy provided a $10 million payment on Mahler's death to the Richard Mahler Family Trust ("Trust"). The beneficiaries of the Trust were Mahler's wife and two children.

The first premium payment on the Policy, good for five years coverage, was $490,000. The premium was paid by First Insurance ("lender"), a premium financing company, in a loan to the Trust. The Policy included an Alternate Surrender Value Rider ("Rider"), which gave Mahler, acting on behalf of the Trust, the option of surrendering the Policy within five years and receiving a full refund of all premiums paid—which would be returned to the lender.

Mahler received a $199,401.60 commission as broker. His commission was paid subject to a controlling form referred to as the Independent Producer Contract ("Contract"), executed by Phoenix and defendant in 2000. The Contract, in three separate provisions, mandated full return of agent commissions to Phoenix, upon return of premium payments to the purchaser of the Policy.

B. Surrender of Policy and Charge Back of Commission

Defendant Mahler, in December 2008 when the Policy was issued, was a successful insurance salesmen working for Phoenix and other agencies. He claimed a worth of some $5 million. He was in good health. The United States economy, however, was sliding into a deep recession. *See, e.g.,* Alexandra Twin, *Dow Plunges 680 Points*, CNN Money, Dec. 1, 2008 ("Year-to-date, the Dow is down 38.6% and has lost 42.5% from its record close of 14164.53 hit on Oct. 9, 2007.").

Phoenix, in 2009, suffered multiple downgrades in its debt rating. The lender, First Insurance, ceased all business transactions with Phoenix and refused to pay any future premiums on the Policy. The downgraded credit rating, and subsequent decision by the lender to discontinue financing Phoenix policies, was reasonable given the pressure on banks, lending institutions, and the volatility in the market in 2009. *See, e.g.,* Nouriel Roubini, *a Global Breakdown of the Recession In 2009*, Forbes, Jan. 15, 2009 ("This will be the worst global recession in decades . . ."). Defendant's wealth, over the next five years, steadily decreased.

Unable to pay the second premium with his own assets, or obtain other financing, Mahler, in 2013, surrendered the Policy to Phoenix. Pursuant to the Policy Rider, Phoenix, returned the $490,000 premium to First Insurance, the lender.

As findings of fact and law below indicate, Phoenix properly demanded a payment back ("charge back") by defendant of his commission on the Policy. This was its right under the 2000 Contract.

### C. Mahler's Defenses and Judgment

Defendant claims he was excused from the charge back provisions because of bad faith and mismanagement of Phoenix which induced the lender to call in the premium loan. His defenses in equity are unavailing. As an experienced life insurance salesperson he knew the risk of loss of his commission and accepted this obligation with open eyes.

Under the terms of the 2000 Contract, Mahler must pay back his full commission on the Policy plus interest. He is not required to pay the costs or legal fees requested by plaintiff. Judgment in the amount of $254,226.06 is entered in favor of Phoenix against Mahler.

II. Findings of Fact

1. Mahler started selling life insurance in 1992 for Lutheran Brotherhood. Trial Transcript ("Trial Tr.") 170:2-11. He sold insurance, throughout his career, for at least four different insurance providers. Trial Tr. 170:10-24.

2. He began selling Phoenix products in the late 1990s. Trial Tr. 170:2-4.

3. On November 22, 2000, Phoenix entered into an Independent Producer Contract ("Contract") with Mahler. 2000 Independent Producer Contract, ECF No. 56, Exh. 1, May 15, 2018 ("Ind. Prod. Contr.").

4. Mahler, pursuant to the Contract, received a commission for each sale of a Phoenix insurance policy, including the sale of the $10 million Policy on his own life. *Id.*

5. The Contract included three provisions that relate to commissions charge backs, they state in pertinent part:

> Should the Company for any reason refund any premium on any Contract sold hereunder . . . You shall repay on demand any compensation received with respect thereto.

Ind. Prod. Contr. at 9.

> Should the Company for any reason refund any premium on any policy sold or annuity hereunder, You shall repay on demand any commissions or any other compensation received therein . . .

*Id.*

> Should the Company for any reason refund any premium on any policy sold or annuity hereunder, You shall repay on demand any commissions or any other compensation received therein . . .

*Id.* at 11.

6. In December 2008, Phoenix contracted to sell a $10 million Phoenix Indexed UL policy ("Policy") insuring Mahler's life, with death benefit payable to the Richard Mahler Family Trust ("Trust"). Defendant's Responses to Requests for Admission, ECF No. 56, Exh. 17,

May 15, 2018 ("Def.'s Resp."). The trustees and beneficiaries of the Trust were Mahler's wife and two sons. Trial Tr. 144:15-17.

7. Mahler acted as both the insurance agent, selling the Phoenix Policy to the Trust, and the insured. Compensation Summary Report, ECF No. 56, Exh. 6, May 15, 2018 ("Comp. Sum. Rep."); Trial Tr. 67:11-17.

8. Phoenix paid Mahler $199,401.60 as commission for the sale of the Policy. Def.'s Resp. ¶ 27; Comp. Sum. Rep.

9. Mahler funded the initial $490,000 premium payment with a premium financing loan. Trial Tr. 186:13-18.

10. To secure the $490,000 loan, the Richard Mahler Family Trust executed a Master Promissory Note, with the Trust as borrower and with a third party, First Insurance, as the lender. Pl.'s Ex. 4. In the Master Promissory Note, the Trust borrowed and promised to repay the principal amount of $490,000 from First Insurance, plus interest to accrue at the rate of 5.6% annually. *Id.* The lender, First Insurance, paid the first premium on the Policy, a total of $490,000. *Id.*

11. The Master Promissory Note specifies that First Insurance has the option, "in its sole discretion," to lend additional funds to Mahler beyond the $490,000 initial principal. *Id.*

12. The Master Promissory Note included a disclaimer stating in bold type: "LENDER SHALL NOT BE REQUIRED TO EXTEND ANY AMOUNTS DUE HEREUNDER (OTHER THAN THE ORIGINAL PRINCIPAL AMOUNT HEREOF) TO BORROWER OR ANY OTHER PERSON OR ENTITY, INCLUDING BUT NOT LIMITED TO ANY ADDITIONAL AMOUNTS NECESSARY TO FUND PREMIUMS DUE IN REGARDS TO THE INSURANCE POLICY."

13. Mahler admitted that he understood that First Insurance retained full discretion to decide whether it would loan him additional funds, and that it was not required to do so. Trial Tr. 178:15-21.

14. Payment of the first premium gave Mahler coverage for five years. *Id.* 12:1-14.

15. Mahler also elected to purchase an Alternate Surrender Value Rider ("Rider"), a contractual addendum to the Policy that, for a charge of over $1,000 per month, gave him the option to surrender the policy within five years and get a full return of the premiums paid. *Id.* 68:23-70:7; 89:4-14, 89:24-90:3.

16. Phoenix offered the Rider for several reasons. Individuals were willing to pay the additional monthly costs in exchange for the added protection of being able to surrender a policy for a full premium refund. *Id.* 89:15-23. In the aggregate, the Rider was profitable for Phoenix; only some purchasers would ultimately exercise this Rider and surrender the Policy, which would require Phoenix to refund the premiums but Phoenix's liability for the death benefit would be extinguished due to the Policy's termination, thus restoring the lender, Phoenix, the broker, and the beneficiary, to their original positions. *Id.* 90:7-16. Other policyholders did not exercise the rider so Phoenix could keep the premiums and the monthly rider charges, making the product profitable in the aggregate. *Id.* 90:17-23.

17. Mahler never discussed Phoenix's financial status or investment strategies with any Phoenix employee or representative before he acquired the policy. Def.'s Resp. at ¶ 11.

18. Phoenix's senior debt rating was downgraded on three separate occasions in 2009. Moody's Investors Service, *Moody's Downgrades Phoenix Cos. Senior Debt to Ba1; Remains on Review*, Rating Action, Feb. 19, 2009; Moody's Investors Service, *Moody's Downgrades Phoenix Cos. Senior Debt to Ba2; Outlook Negative*, Rating Action, Mar. 10, 2009; Moody's

Investors Service, *Moody's Downgrades Phoenix Cos. Senior Debt to B1; Outlook Negative*, Rating Action, Sept. 08, 2009.

19. Primarily, as a result of the downgraded senior debt rating, First Insurance, the lender, refused to finance Phoenix policies. First Insurance Email, ECF No. 42, Exh. H, May 15, 2018 ("First Ins. Email").

20. First Insurance did not pay the second premium on the Policy. *Id.* Mahler was unable to find other financing, or fund the premium himself. Trial Tr. 190:1-16.

21. Because of nonpayment of the second premium, the Policy was surrendered to Phoenix on Nov. 18, 2013. Policy Transaction Confirmation, ECF No. 56, Exh. 7, May 15, 2018. This was less than one month shy of the five-year deadline to exercise the Rider. Trial Tr. 184:19-21; 189:13-21.

22. Mahler had various options available to him during the time his family Trust owned the policy. He could exercise the Rider within its five-year period and receive a full refund of the $490,000 paid in premiums, and use it to repay the lender. *Id.* 189:13-18. Or, he had the option to not exercise the Rider, wait until the policy lapsed (or paid additional premiums to keep it in force), and find another means to repay his loan. *Id.* at 190:7-16. He also could have sought to take out another loan from the lender or find another source of credit. *Id.* at 191:6-9.

23. Mahler elected to surrender the policy and exercise the Rider, asserting that the other options were not viable because he did not have sufficient funds to repay the loan outright, and his finances were such that he would not have been approved for another loan. *Id.* at 174:21-175:1; 190:7-11; 191:6-9.

24. Because of Mahler's surrender of the Policy, Phoenix refunded the $490,000 premium payment to the lender, First Insurance, on November 18, 2013. Trial Tr. 173:14-16.

25. Phoenix demanded return of Mahler's commission on December 19, 2013. Trial Tr. 206:12-13.

26. Phoenix seeks $181,055.03—Mahler's commission on the Policy. Copy of Letter Confirming Mahler's Outstanding Debt to Phoenix, ECF No. 56, Exh. 11, May 15, 2018; Def.'s Resp. at ¶ 40.

27. Prejudgment interest on the $181,055.03 outstanding debt, commencing when Phoenix demanded payment on December 19, 2013 and continuing through today's date, June 15, 2018, totals $73,171.03.

28. Mahler summed up his defenses in equity in his "Final Request For Dismissal", Exh. 1, June 11, 2018. Mahler argued:

a. "Phoenix's risky, deceitful, shady business practices were concealed from me and the Public prior to taking my Life policy out. It is these risky business practices that caused Phoenix's ratings to decline, which ultimately caused the Lender to refuse to lend me funds to pay for the policy. It was Phoenix's bad business practices that forced me to make the Best worst surrender decision and lose the policy."

The court finds that the life insurance Mahler sold, although atypical, was legal in the insurance industry and remains legal today. He provided no admissible evidence at trial that Phoenix was engaged in risky or shady business practices or that he reasonably relied on a representation that they were not engaged in such a practice. Trial Tr. 17:2-14 ("[T]his type of arrangement is legitimate. There are a number of premium financing programs out there . . . These loans were

approved because this particular lender had a full recourse provision in it that made the borrower personally guarantee the loan.").

b. "I should not have a chargeback at all since it was well past the standard charge back period, which is a 12 month charge back period."

The court finds that no charge back period was specified in the Contract for this Policy. A Phoenix representative testified at trial, without contradiction, that the charge back period is determined on a case by case basis, with no set industry standard. Trial Tr. 103:4-11 ("Chargeback [period] . . . is dependent on the product . . . it depends if it's an annuity, depends if it's a life insurance policy, what life insurance policy it is.").

c. "The 2004 contract . . . has a 12 month charge back and should be the [operative contract]."

The court finds that this charge back provision referred to a different Phoenix insurance policy, not the Phoenix UL Indexed Life Insurance Policy at issue, and is not indicative of a general 12 month charge back rule. Trial Tr. 109:20-22 ("[T]he product in question is not on that schedule").

d. "If the 2000 contract should be allowed then that would also be a 12 month charge back period, thus the surrender of the Premium was well past the 12 month charge back period with no charge back of commissions."

The court finds that there is no provision in the 2000 Contract—or any other writing—indicating a 12 month charge back provision for the Policy. Trial Tr. 155:1-5 ([U]pon return of full premium, there [is] a [one] hundred percent chargeback . . . Any time we see a rec[i]ssion or a cold return of premium, there [is] a [one] hundred percent chargeback . . . that's across the board all our products.").

29. The court repeatedly advised the defendant to retain counsel:

> THE COURT: Mr. Mahler, I repeatedly explained to you that this is a highly technical case and that you need an attorney. I am not in a position to assign an attorney for you and I can give you only limited help because everybody is equal in this court, at least theoretically. Do you understand?
> MR. MAHLER: I do, Your Honor. Thank you.
> THE COURT: Do you want time to get an attorney?
> MR. MAHLER: Excuse me?
> THE COURT: Do you wish time to get an attorney?
> MR. MAHLER: No, thank you. Not at this time.

*See, e.g.,* Trial Tr. 2:13-23.

III. Law

A contract agreed to and performed in New York is governed by New York Law. *Bellevue South Assoc. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 293 (1991).

    A. Breach of Contract

A contract exists when both parties intend to enter an agreement and settle on the nature of the material terms. *Stonehill Capital Mgt. LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016). The finder of fact looks to the words of the contract and objective manifestations of the parties' behavior "as gathered by their expressed words and deeds" to indicate their intent. *Brown Bros. Electrical Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y. 2d 397, 399 (1977). A breach of contract occurs when one party fails to perform its obligations under a binding agreement. *Stonehill Capital Mgt. LLC*, 28 N.Y.3d at 448.

    B. Equitable Estoppel

Equitable estoppel requires: "(1) conduct which amounts to a false representation or concealment of material facts . . . ;(2) intention, or at least expectation, that such conduct shall be acted upon by the other party; and (3) knowledge, actual or constructive, of the real facts." *New York State Guernsey Breeders' Co-op., Inc. v. Noyes,* 260 A.D. 240, 248 (3d Dep't 1940). The party claiming estoppel must demonstrate a lack of knowledge of the true facts and actual

reliance upon the misrepresentation that results in detriment. *Broadworth Realty Assoc. v. Chock 336 B'way Operating, Inc.*, 562 N.Y.S.2d 630, 632 (1st Dep't 1990).

Without a contractual term explicitly creating a "special relationship" of trust and confidence, such as a fiduciary relationship, the allegation that one party possesses particular expertise is insufficient to create a duty to disclose information. *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996). An independent contractor relationship is not one which creates a relationship of trust and confidence, nor is that of insurer and the insured. *Batas v. Prudential Ins. Co. of America*, 281 A.D.2d 260, 264 (1st Dep't 2001).

C. Promissory Estoppel

Promissory Estoppel requires: "(1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc. v. Le Havre Associates*, 88 A.D.2d 120, 122 (2nd Dep't 1982).

D. Implied Covenant of Good Faith and Fair Dealing

In every contract there is an "implied obligation to exercise good faith not to frustrate the contract[] into which [the parties] have entered." *Grad v. Roberts*, 14 N.Y.2d 70, 75 (1964). Technical compliance with the terms of contract is insufficient to satisfy this duty if a party deprives the other of expected benefits of the bargain. *Van Valkenburgh, Nooger & Neville, Inc v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46 (1972). If a party's actions are in its own best interest and only incidentally lessen the value to the other party, there is no breach. *Id.* There may come a point where self-interested activity is so prejudicial to the other party that a court is justified in finding a violation of the covenant. *Id.*

E. Unjust Enrichment

In order to state a claim for unjust enrichment, the moving party must show: "(1) the other party was enriched; (2) at the moving party's expense; and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 182 (2011).

F. Attorney's Fees

The "American Rule" dictates that parties bear their own costs of litigation absent a statute, agreement, or court rule to the contrary. *Gotham Partners, L.P. v. High Riv. Ltd. Partnership*, 76 A.D. 3d 203, 204 (1st Dep't 2010). For parties to opt out of this default situation by agreement, the terms of their accord must be "unmistakably clear from the language of the promise." *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989). "[F]or an indemnification clause to cover claims between the contracting parties rather than third party claims, its language must unequivocally reflect that intent." *Gotham Partners, L.P.,* 76 A.D.3d at 206.

G. Pre-Judgment Interest

In breach of contract actions where parties do not specify an exclusive remedy, statutory prejudgment interest awards are required pursuant to N.Y. CPLR 5001(a). *J. D'Addario & Co., Inc. v. Embassy Indus., Inc.*, 20 N.Y. 3d 113, 117 (2012). Interest accrues from "the earliest ascertainable date the cause of action existed" and is calculated on the "total sum awarded." NY CPLR 5001(b); N.Y. CPLR 5002. The interest rate is 9% per annum. N.Y. CPLR 5004; *see also* Siegel, N.Y. Prac. § 411 (5th ed.) ("Suppose, for example, that on October 18 the plaintiff is awarded a verdict of $20,000 on a property damage claim accruing exactly three years earlier. At 9% per year, interest on that sum would be $5400, and the verdict should then be treated as one for $25,400.").

IV. Application of Law to Facts

    A. Breach of Contract

Mahler was contractually obligated to return the commission. His failure to do so constitutes a breach of the Contract. Three separate "charge back" clauses mandate that, upon refund of premium, Mahler return the commission:

> Should the Company for any reason refund any premium on any Contract sold hereunder . . . You shall repay on demand any compensation received with respect thereto.

Ind. Prod. Contr. at 9.

> Should the Company for any reason refund any premium on any policy sold or annuity hereunder, You shall repay on demand any commissions or any other compensation received therein . . .

*Id.*

> Should the Company for any reason refund any premium on any policy sold or annuity hereunder, You shall repay on demand any commissions or any other compensation received therein . . .

*Id.* at 11.

The language of the ruling 2000 Contract is unambiguous; when a policy is surrendered and a premium is refunded, the facilitating agent must return the commission. Mahler did not repay the commission and therefore breached the "charge back" terms of the Contract.

    B. Mahler's Defenses in Equity

        1. Equitable Estoppel

Mahler argues that Phoenix did not disclose the precarious financial position of the company and but-for this nondisclosure, he would not have purchased the Policy. Trial Tr. 38:7-8.

Plaintiff had no duty to disclose their economic outlook to Mahler. There is no general duty to disclose information in the absence of a "special relationship" between the parties, or a

14

previous misstatement which requires correction. *Wilson v. Dantas,* 80 N.E. 3d 1032, 1042 (2017). Phoenix and Mahler did not have a "special relationship." *Id.* (requiring a fiduciary or confidential relationship); *Kimmell,* 89 N.Y. 2d at 264 (finding particular expertise or superior knowledge alone does not create a special relationship); *Batas,* 281 A.D. 2d at 264 (finding the relationship between insurer and the insured is not a special relationship).

Even if Phoenix owed a duty to disclose, Mahler has not demonstrated that his reliance on the nondisclosure resulted in any detrimental action. *New York State Guernsey Breeders' Co-op, Inc.,* 260 A.D. at 248. Return of the commission removes an unearned benefit and restores the parties to the positions they occupied prior to issuance of the Policy in 2008. *See Fischer v. Bright Bay Lincoln Mercury,* 234 A.D.2d 586, 587 (2nd Dep't 1996) (refunding money unearned because of breach of contract returns parties to status quo ante).

Phoenix had no duty to disclose its financial outlook. There is no proof Phoenix knew its finances were deteriorating. Mahler has failed to demonstrate any detrimental reliance. Equitable estoppel is denied.

2. Promissory Estoppel

Mahler cannot defend on a theory of promissory estoppel. He fails to show reliance on any promise made by Phoenix. *Ripple's of Clearview, Inc.,* 88 A.D.2d at 123. Several explicit terms in the Contract stated agents may have to repay commissions. Ind. Prod. Contr. For this reason, it was neither foreseeable nor reasonable for Mahler to assume that he would be entitled to keep the commission.

3. Implied Covenant of Good Faith and Fair Dealing

Mahler argues Phoenix breached the implied covenant of good faith and fair dealing, an inferred obligation present in every contract which forbids one party from behaving in a manner that prevents the other from receiving the benefit of the bargain. *Grad,* 14 N.Y.2d at 74. Mahler

claims Phoenix engaged in "shady" business practices which in turn caused: (1) their senior debt rating to drop; (2) First Insurance's nonpayment of the second premium; and (3) Mahler's loss of commission. Trial Tr. 38:13-39:23. Mahler's proof of "shady" business practices is limited to deposition testimony of former Phoenix employees in unrelated litigation. This evidence is inadmissible hearsay and has almost no probative value. *See* Fed. R. Evid. 804(b) (Former deposition or trial testimony may be admissible if "now offered against a party who had--or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross, or redirect examination."). It is not credited by the court.

Even if plaintiff engaged in "shady" practices, which is unproven, there is no indication that such practices caused their senior debt rating to drop. The court takes judicial notice that 2009 was a difficult financial year and many businesses suffered severe debt and credit downgrades as a result.

### 4. Unjust Enrichment

Defendant's unjust enrichment claim fails. Plaintiff repaid the entire $490,000 premium to the lender, First Insurance.

### C. Attorney's Fees

An Independent Producer Contract was executed between Mahler and Phoenix. It granted him authority to act as a "producer" and sell Phoenix insurance products for a commission. The Contract anticipated liability that could arise from third party actions against Phoenix or "otherwise." Paragraph 5, "Indebtedness/Indemnification," states:

> You agree to indemnify the Company for any indebtedness or obligations created by You or employees or subproducers associated with You, whether arising hereunder or otherwise. You also agree to indemnify the Company for any liabilities, losses, costs or expenses incurred or moneys paid by the Company to any person as a result of the misrepresentations, negligence, or unauthorized acts by You...

> The Company... may set off such obligation or indebtedness from any compensation payable under this contract or any other contract that You may have with the Company . . . In addition You agree to reimburse the Company for any attorney's fees, expenses or collection costs incurred in the enforcement of this provision.

The first paragraph of the "Indebtedness/Indemnification" section focuses on liability created by "indebtedness or obligations" or agent "misrepresentation, negligence, or unauthorized acts" in the sale of insurance to a third party. The language indemnifying "*misrepresentations, negligence, or unauthorized acts*" envisions liability from an agent misleading a third party insurance purchaser.

The second paragraph demands reimbursement for attorney's fees in relation to enforcement of "this section." An agent, for example, who amends an insurance policy without Phoenix consent, and then sells such policy to a third party, may be liable under this section for indemnification or for costs or attorney's fees, if the third party brings suit against Phoenix to recover damages for the *unauthorized act* of the agent.

The provision never explicitly references indemnification of actions between Phoenix and their agents for a charge back of commission. *Id.* It anticipates setting off such third party obligation against any compensation owed to the agent, but makes no reference of indemnification for fees or legal expenses incurred in seeking return of an agent's commission.

The "strict standard imposed by [the New York Court of Appeals] requires [that] . . . the provision must unequivocally be meant to cover claims between the contracting parties rather than third-party claims." *Gotham Partners, L.P. v. High River Ltd. P'ship*, 76 A.D.3d 203, 207 (2010). Here, it is not "unmistakably clear" that the "Indebtedness/Indemnification" provision refers to suits between Phoenix and one of its own agents. *Hooper Associates, Ltd.* 74 N.Y.2d at

492. The provision appears to indemnify only indebtedness that results from a third party suit. Phoenix's request for attorney's fees is denied.

D. Interest and Judgment Calculation

Four years and 179 days have elapsed since Phoenix's initial demand for return of commission paid on December 19, 2013. Trial Tr. 206:13-14. 9% interest per annum on $181,055.03 from time of demand to date yields interest due of $73,171.03. The total judgment is $254,226.06 (amount due + interest).

V. Conclusion

Mahler is liable for the balance of his commission on the Policy. Judgment in the amount of $254,226.06 shall be entered in favor of PHL Variable Insurance Co. against Richard Mahler, Jr. Mail and electronically mail a copy of this opinion to both parties.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated: June 20, 2018
　　　　Brooklyn, New York